UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

THOMAS CONRY, KELSEY DAKER,                :
HAILEY RONAYNE, and ROBYN SUSSMAN,         :
individually and on behalf of all others similarly  :
situated,                                    :
                                             :
              Plaintiffs,                    :        Civil Action No.   3:24cv295
                                             :
       v.                                    :
                                             :
GERBER PRODUCTS COMPANY,                     :
PERRIGO COMPANY PLC,                         :        CLASS ACTION COMPLAINT
L. PERRIGO COMPANY, and PBM                  :
NUTRITIONALS, LLC,                           :        JURY TRIAL DEMANDED
                                             :
              Defendants.                    :

       Plaintiffs Thomas Conry, Kelsey Daker, Hailey Ronayne, and Robyn Sussman

("Plaintiffs"), on behalf of themselves individually and on behalf of all others similarly situated

(the "Classes" as defined in ¶¶ 97-98 below), upon personal knowledge as to the facts pertaining

to themselves and upon information and belief as to all other matters, and based on the

investigation of counsel, bring this class action to recover injunctive relief, treble damages, and

other appropriate relief. Plaintiffs bring this class action based on violations of federal and state

antitrust laws, and state unfair competition and unjust enrichment laws by Gerber Products

Company ("Gerber"), Perrigo Company PLC ("Perrigo Parent"), L. Perrigo Company ("LPC")

and PBM Nutritionals, LLC ("PBM," together with Perrigo Parent and LPC, "Perrigo," and

collectively with Gerber, "Defendants").

## NATURE OF THE ACTION

       1.     This is a class action challenging Defendants' anticompetitive conduct in violation

of the antitrust laws of the United States, (Section 16 of the Clayton Act (15 U.S.C. § 26), to secure

injunctive relief against Defendants under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2)), along with damages under various state laws. Plaintiffs bring this action on behalf of themselves and the Classes of indirect purchasers of store-brand ("Store-Brand")[1] infant formula from Perrigo through U.S. retailers[2] ("Retailers") from April 22, 2020 to the present ("Class Period").[3]

2.      At all relevant times, Perrigo maintained dominance in the relevant product market for the sale of Store-Brand infant formula to Retailers within the relevant geographic market – the United States (the "Relevant Market").

3.      Multiple factors make entry into the Relevant Market prohibitive, including the very high cost to build an infant formula manufacturing plant and the time and resources necessary to meet the FDA's stringent quality standards for new formula.

4.      Not satisfied with steep entry barriers, and in order to further protect its continuing market dominance, Perrigo entered into an unlawful agreement with Gerber to foreclose competition in the Relevant Market, resulting in higher prices and harm to consumers.

5.      A potential competitor to Perrigo, P.L. Developers, LLC ("PLD"), sought to enter the Relevant Market. PLD contracted with Gerber (the "Contract," attached hereto as Exhibit 1), which had excess capacity and agreed to sell infant formula to PLD. In turn, PLD would package, market, and sell that infant formula as Store-Brand infant formula to Retailers.

---

[1] Store-Brand products are sold under private label brands by a retailer in its specific chain of stores.
[2] Retailers include Walmart, Kroger, CVS, Target, Meijer, Rite Aid, Costco, and Walgreens, to name a few.
[3] Discovery is necessary to determine the full scope of the anticompetitive conduct, including the time frame, products, and participants. Discovery may demonstrate actionable conduct outside the Class Period, and accordingly Plaintiffs reserve the right to amend to expand the time period covered by the claims alleged.

6.      Under the Contract, PLD and Gerber agreed to a partnership (the "Partnership") for an initial period of seven (7) years to manufacture and distribute Store-Brand infant formula for Retailers, in competition with Perrigo.

7.      However, Gerber did not tell PLD that Gerber and Perrigo had an existing agreement, which gave Perrigo a "first right" to Gerber's excess capacity (the "Anticompetitive Agreement") and allowed Perrigo to block any other competitor from entering the Relevant Market, which is exactly what it did.

8.      The Anticompetitive Agreement was intended to and did keep new entrant(s) out of the Relevant Market, and has preserved Perrigo's monopoly in that market.

9.      When Gerber informed Perrigo of its Contract with PLD, Perrigo exercised its "first right" under the Anticompetitive Agreement and acquired Gerber's excess capacity that Gerber had promised to PLD. In other words, Gerber reneged on the Contract with PLD in order to comply with the Anticompetitive Agreement with Perrigo.

10.     By excluding PLD from the Relevant Market as a competitor to Perrigo, Gerber and Perrigo protected monopoly profits garnered by Perrigo to the detriment of the Retailers and, ultimately, consumers nationwide, like Plaintiffs and the Classes.

## PARTIES

11.     Plaintiff Thomas Conry is a resident of California. During the Class Period and while residing in California, Plaintiff Conry indirectly purchased Perrigo Store-Brand infant formula in California for personal use and not for resale. Plaintiff Conry suffered injury as a result of Defendants' conduct alleged herein.

12.     Plaintiff Kelsey Daker is a resident of Illinois. During the Class Period and while residing in Illinois, Plaintiff Daker indirectly purchased Perrigo Store-Brand infant formula in

Illinois for personal use and not for resale. Plaintiff Daker suffered injury as a result of Defendants' conduct alleged herein.

13.    Plaintiff Hailey Ronayne is a resident of Michigan. During the Class Period and while residing in Michigan, Plaintiff Ronayne indirectly purchased Perrigo Store-Brand infant formula in Michigan for personal use and not for resale. Plaintiff Ronayne suffered injury as a result of Defendants' conduct alleged herein.

14.    Plaintiff Robyn Sussman is a resident of Pennsylvania. During the Class Period and while residing in Pennsylvania, Plaintiff Sussman indirectly purchased Perrigo Store-Brand infant formula in Pennsylvania for personal use and not for resale. Plaintiff Sussman suffered injury as a result of Defendants' conduct alleged herein.

15.    Defendant Perrigo Parent is a corporation that manufactures and sells pharmaceutical and personal care products, including Store-Brand infant formula. Perrigo Parent is incorporated in Ireland and has its principal place of business in Grand Rapids, Michigan.

16.    Defendant LPC is a corporation that manufactures and sells pharmaceutical and personal care products, including Store-Brand infant formula. LPC is incorporated in Michigan and has its principal place of business in Allegan, Michigan. LPC is a direct wholly-owned subsidiary of Perrigo Parent.

17.    Defendant PBM is a limited liability company incorporated in Delaware and has its principal place of business in Milton, Vermont. As of 2010, PBM was the world's largest manufacturer of Store-Brand infant formula. It sells infant formula under its own label as well as

under private-label brands, including chain stores like Wal-Mart and Target. Perrigo Parent acquired PBM in 2010.[4] PBM is an indirect wholly-owned subsidiary of Perrigo Parent.

18.     Defendant Gerber is a corporation that manufactures and sells baby food, infant formula, and other child nutritional products. Gerber does not sell Store-Brand infant formula to Retailers. Gerber is incorporated in Michigan and has its principal place of business in Arlington, Virginia.

19.     Until recently, Gerber was a direct wholly-owned subsidiary of Nestlé Holdings, Inc., which is an indirect wholly-owned subsidiary of Nestlé, S.A. ("Nestlé"). Nestlé acquired Gerber and its Good Start formula brand in 2007. In December 2022, Nestlé sold the U.S. and Canadian rights to the Gerber Good Start brand to Perrigo, as well as its manufacturing plant in Wisconsin.

20.     Unnamed co-conspirators include others who acted in concert with Defendants as to the anticompetitive conduct alleged herein.

21.     As a result of Defendants' anticompetitive conduct described herein, Plaintiffs and other putative class members paid more for Store-Brand infant formula than they would have paid absent Defendants' anticompetitive conduct.

## JURISDICTION AND VENUE

22.     Plaintiffs bring this class action on behalf of the Damages Class to recover actual and/or compensatory damages, including double and treble damages as permitted by state law. This class action is brought on behalf of the Nationwide Class to enjoin Defendants' conduct in anticompetitively fixing, maintaining, and/or stabilizing the price of Store-Brand infant formula.

---

[4] *Perrigo Acquires Infant Formula Manufacturer PBM Holdings for $808 Million* (Mar. 23, 2010), https://investor.perrigo.com/2010-03-23-Perrigo-Acquires-Infant-Formula-Manufacturer-PBM-Holdings-for-808-Million (last visited April 18, 2024).

Plaintiffs bring this action on behalf of the Nationwide Class (defined below) under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2). This court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

23.    Plaintiffs also assert claims for actual and exemplary damages and injunctive relief pursuant to state antitrust, unfair competition, and unjust enrichment laws, and seek to recover damages, obtain restitution, and secure other relief against Defendants for violation of those state laws. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the Classes are citizens of a state different from some Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (c) and (d) because one or more Defendants resided or transacted business in this District and/or is licensed to do business and/or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

25.    This Court has personal jurisdiction over each Defendant because, *inter alia,* each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, shipped, sold, and/or delivered substantial quantities of Store-Brand infant formula throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in anticompetitive conduct that was

directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

## INTERSTATE TRADE AND COMMERCE

26.     The primary effect of Defendants' anticompetitive conduct has been on domestic commerce. Perrigo manufactures and sells Store-Brand infant formula across state lines in an uninterrupted flow of interstate commerce.

27.     PLD contracted with Gerber to enable PLD to enter the Relevant Market. But as a result of Defendants' unlawful Anticompetitive Agreement, Defendants conspired to keep PLD out of that market, which has resulted in, and will continue to result in, artificially inflated prices for Store-Brand infant formula.

28.     Accordingly, the anticompetitive effects of Defendants' actions have manifested primarily in interstate commerce in the United States, where Retailers and consumers were deprived of competition in the market, thereby increasing prices, reducing innovation and quality of service, and lowering output.

## FACTUAL BACKGROUND

I.    **The Relevant Market for the Sale of Store-Brand Infant Formula**

29.     The relevant product market is the sale of Store-Brand infant formula to Retailers, and the relevant geographic market is the United States.

30.     The production of infant formula in the United States is heavily concentrated. Four manufacturers account for 99% of infant formula sold in the United States: (1) Gerber, (2) Perrigo,

(3) non-party Abbott Laboratories ("Abbott"), and (4) non-party Mead Johnson & Company LLC ("Mead Johnson").[5]

31.    Perrigo is the only manufacturer of Store-Brand infant formula sold to Retailers in the United States.

32.    Gerber, Abbott, and Mead Johnson do not sell Store-Brand infant formula to Retailers, but instead only sell infant formula under their national brands ("Branded" infant formula).[6] Those national brands of infant formula are: (1) Similac® (sold by Abbott), (2) Enfamil® (sold by Mead Johnson), and (3) Defendant Gerber's Good Start®.

33.    The sale of Store-Brand infant formula to Retailers is distinct from and not reasonably interchangeable with the sale of Branded infant formula to Retailers.

34.    While Store-Brand infant formula products are manufactured to be the same as or equivalent to Branded products, they are marketed very differently by the manufacturers. Manufacturers of Branded infant formula, for example, compete with each other by spending millions of dollars annually on advertising and marketing to attract new parents to their Branded formulas.

35.    By contrast, Store-Brand suppliers do not focus on marketing. Instead, they sell the product to Retailers at a significantly discounted price so that Retailers can (1) offer the product to consumers at a discount to the Branded products, and (2) still make more profit on the sale of the Store-Brand product than they do on the Branded products. In the case of infant formula, Retailers

---

[5] *Market Factors Relevant to Infant Formula Supply Disruptions 2022: A report of the Federal Trade Commission*, March 13, 2024, available at https://www.ftc.gov/system/files/ftc_gov/pdf/infant-formula-report.pdf (last visited April 18, 2024).
[6] Branded products are distributed nationally through various retail chains under a brand owned by a manufacturer or distributor.

sell the Branded products at prices that may exceed the price of Store-Brand products by 60% or more.[7]

36.    Manufacturers of Branded infant formula do not sell Store-Brand infant formula to Retailers. Both Abbott and Mead Johnson lack the additional capacity to expand their production of infant formula beyond their current levels utilized for their national brands, and they do not have the ability to further scale up production to sell infant formula for resale as Store-Brand infant formula to Retailers.[8] The third Branded manufacturer, Gerber, had additional capacity, but as discussed below, it conspired with Perrigo, in breach of its Contract to supply PLD, not to use its available capacity to supply PLD with the Store-Brand infant formula, which would have allowed PLD to compete in the Relevant Market.

37.    The relevant geographic market is the United States. As discussed below, the manufacture of infant formula is subject to import tariffs and other substantial federal regulations. The United States imports very little infant formula, i.e., an average of only 3.2 million kilograms of formula annually between 2012 and 2021, as compared to an average domestic production during that same period of 524 million kilograms.[9]

---

[7] *See Perrigo Announces Strategic Investment to Expand and Strengthen U.S. Manufacturing of Infant Formula*, available at https://investor.perrigo.com/2022-11-01-Perrigo-Announces-Strategic-Investment-to-Expand-and-Strengthen-U-S-Manufacturing-of-Infant-Formula (last visited April 18, 2024) ("Prior to the Gateway plant purchase, Perrigo had insufficient capacity to meet consumer demand for its 17 store brand customers that sell infant formula at approximately a 50% discount to te [sic] major national brands.").

[8] In 2022, the United States experienced a formula shortage and Mead Johnson could not increase production to meet demand and was required to obtain approval from the FDA to import formula from Mexico. *See Reckitt's Mead Johnson Receives FDA Approval to Import 66 Million Servings of Infant Formula Focusing on Vulnerable Consumers*, https://www.prnewswire.com/news-releases/reckitts-mead-johnson-receives-fda-approval-to-import-66-million-servings-of-infant-formula-focusing-on-vulnerable-consumers-301569076.html (last visited April 18, 2024).

[9] Congressional Research Service, *Tariffs and the Infant Formula Shortage*, Christopher A. Casey, May 23, 2022, available at https://crsreports.congress.gov/product/pdf/IN/IN11932 (last visited April 18, 2024).

38.     Perrigo's Store-Brand infant formula business generates hundreds of millions of dollars annually.

39.     Perrigo sells its Store-Brand infant formula to 68 Retailers, which in turn sell formula to consumers in more than 40,000 retail locations throughout the United States. Perrigo is the only supplier of Store-Brand infant formula and, as a result, Retailers have no choice but to pay the monopoly prices demanded by Perrigo.

## II.    High Barriers to Entry in the Relevant Market

40.     On May 14, 2019, Perrigo's CEO described the high barriers to entry as creating "significant" and "high moats," acknowledging that "there are only 3 or 4 approved manufacturers in the United States, and it's been 20 years since the FDA approved another." Among such barriers are (1) the cost to construct an infant formula manufacturing plant, which would cost at least tens of millions of dollars and take years to complete, and (2) the expense and time required to conduct clinical trials required under FDA regulations for marketing of new infant formula products.

41.     FDA regulations require that new infant formula meet two "quality factors."[10] The formula must support "normal physical growth"[11] and contain proteins of "sufficient biological quality."[12] Meeting the two factors requires weeks of clinical testing.

42.     To satisfy these factors, the manufacturer must (1) run a specific preclinical study measuring protein efficiency,[13] and (2) conduct a "well-controlled growth monitoring study,"[14] which requires a minimum of 15 weeks. The FDA may exempt a manufacturer from the two required studies, but the exemption process is similarly time and resource intensive.

---

[10] 21 CFR § 106.96.
[11] *Id.* § 106.96(a).
[12] *Id.* § 106.96(e).
[13] *Id.* § 106.96(f).
[14] *Id.* § 106.96(b).

43.     The FDA also has specific requirements for the formula contents, such as minimum and maximum quantities of various nutrients.[15] If the formula does not meet the required quality factors or nutritional content specifications, it is deemed adulterated.[16]

44.     Before a manufacturer can market its formula, it must go through a months-long process of submissions to the FDA, including a "notice of intent" that details the formula's contents and directions for use, and demonstrates the formula's "quality" as supported by the manufacturer's required studies.[17]

45.     A manufacturer must spend at least 195 days in an evaluation phase before it can begin selling formula, and the FDA may require additional information, which can further delay the process.

46.     While the FDA categorizes infant formula as food, many aspects of the regulatory scheme are similar to its regulation of pharmaceuticals. Some infant formula manufacturers have spent more than $190 million and five years of work in the evaluation phase before making their first sale.[18]

47.     In contrast to formula, baby food has no similar set of regulations, and the FDA regulates it as it does other foods. The difference in approach is based on the logic that formula constitutes a newborn's "sole source of nutrition."[19]

---

[15] *Id.* § 107.100.
[16] *Id*. § 106.1; 21 U.S.C. § 350a.
[17] 21 CFR § 106.120.
[18] *A Startup Wanted to Make a Better Baby Formula. It Took Five Long Years*, Forbes (Mar. 17, 2022), available at https://www.forbes.com/sites/laurendebter/2022/05/17/byheart-startup-wanted-to-make-a-better-baby-formula-it-took-five-years/?sh=3d743e2d623e (last visited April 18, 2024).
[19] *FDA Evaluation of Infant Formula Response*, U.S. Food & Drug Admin. (Sept. 2022), available at https://www.fda.gov/media/161689/download (last visited April 18, 2024).

48.     To attract Retailer interest, entry into the Store-Brand infant formula market requires multiple types of formula, adding millions in costs for clinical trials.

49.     The FDA treats incumbent formula manufacturers differently. Existing manufacturers of infant formula, like Gerber, do not have to conduct any clinical trials to sell their products, because they are "grandfathered in" and are thus exempt from the requirement to conduct growth monitoring studies for their existing formulas.

50.     Because of these barriers to entry and the high market concentration, the overall infant formula market is susceptible to tacit or explicit collusion. In 1992, the FTC charged Abbott, Mead Johnson, and American Home Products Corp. (later known as Wyeth) for violating Section 5 of the FTC Act. In 1991, the Florida Attorney General filed a complaint against infant formula manufacturers alleging price-fixing.

## III.    PLD Attempts to Compete with Perrigo

51.     PLD is a family-owned and -operated business that contracts with major Retailers nationwide to supply them with Store-Brand over-the-counter ("OTC") products.

52.     PLD manufactures, packages, and distributes a broad range of Store-Brand pharmaceutical and consumer healthcare products. Its products include, for example, solid and liquid dose OTC analgesic, digestive, cough/cold, allergy, sleep, and motion sickness medication. PLD's products also include first aid ointments and related products, personal and feminine care, supplements, electrolytes, and nicotine replacement therapy products.

53.     PLD and Perrigo compete to supply Retailers with Store-Brand products to be sold to consumers.

54.     To effectively serve Retailers and ensure a reliable, uninterrupted supply to U.S. consumers of Store-Brand alternatives to Branded products, PLD maintains manufacturing,

packaging, and distribution facilities in Westbury, NY; Copiague, NY; Miami, FL; Lynwood, CA; Clinton, SC; Piedmont, SC; and Duncan, SC.

55.     Perrigo, which is PLD's primary competitor for the sale of Store-Brand OTC pharmaceutical products to Retailers, is the largest supplier of Store-Brand OTC pharmaceutical products in the United States.

56.     PLD attempted to enter the Relevant Market, which would result in broader supply options for Retailers, lower prices, and increased output. Such increased competition would concomitantly result in lower prices for consumers such as Plaintiffs and members of the Classes.

## IV.     The Contract Between Gerber and PLD

57.     In late 2019, PLD identified Gerber as a viable business partner to facilitate PLD's entry into the Relevant Market.

58.     By partnering with Gerber, PLD could enter the Relevant Market and sell Store-Brand infant formula to Retailers without the significant expenditures and burden of lengthy clinical trials, including infant growth-monitoring studies.

59.     Beginning in late 2019, and continuing through early 2021, PLD and Gerber negotiated an agreement (the "Contract," *see* ¶ 5 above; Ex. 1) by which (1) Gerber would manufacture and provide PLD with infant formula products; (2) PLD would package, market, sell, and distribute those products to Retailers in the United States for resale under their Store-Brand labels; and (3) Gerber and PLD would share the profits from PLD's sales to Retailers.

60.     Gerber and PLD had agreed upon the price of the Store-Brand infant formula to be sold to PLD that would make the Contract profitable to both Parties.

61.     The Contract negotiations lasted fifteen months, and on February 26, 2021, PLD and Gerber executed the Contract subject to terms of strict confidentiality.

62.    The Contract, titled "Memorandum of Understanding (Binding)," contains all the essential elements of a valid, binding, and enforceable contract, including (a) price, (b) quantity, and (c) time and manner of delivery. *See* Ex. 1.

63.    The price PLD agreed to pay Gerber per 19-ounce unit is redacted, but the Contract provides that "PLD will pay Gerber for each of the Products, packaged in brite-stock packaging."[20] *See* Exhibit 1 at 3.

64.    With respect to quantity, the Contract provides that "PLD shall purchase from Gerber all of PLD's requirements of the Products, for resale as Store-Brand products within the Territory." *See* Exhibit 1 at 2. The Contract defines the "Territory" as "the United States of America and its territories and possessions and military installations." *Id.*

65.    The Contract also sets forth Gerber's duties, including sourcing raw materials, manufacturing, packaging into brite-stock, warehousing, distributing, shipping, and sales. *See id.*

66.    The terms and conditions of PLD's standard Purchase Order form (attached as Exhibit 2) govern all purchases and sales made under the Contract and provide additional details concerning time and manner of delivery.

67.    In addition to memorializing all essential terms of price, quantity, and time and manner of delivery, the Contract provides other terms and conditions governing performance.

---

[20] "Brite-stock" refers to manufacturing in unlabeled containers that can then be labeled for the specific customer.

## V.    Perrigo's Anticompetitive Agreement with Gerber

68.    Perrigo knew that two of the three Branded infant formula manufacturers (Abbott and Mead Johnson) lacked the capacity to meaningfully enter the Relevant Market, and thus sought to protect its monopoly through the Anticompetitive Agreement with Gerber.

69.    The Anticompetitive Agreement, among other things, gave Perrigo a "first right" to Gerber's excess capacity, which empowered Perrigo to prevent any other competitor from entering the Relevant Market by purchasing Gerber's excess supply.

70.    Perrigo knew that Gerber (a) possessed enough excess capacity to supply the entire Store-Brand infant formula market, and (b) would not be required to conduct the extremely expensive, time-consuming clinical trials and infant growth monitoring studies required of a new entrant in the Relevant Market.

71.    The Anticompetitive Agreement prevented Gerber from selling its excess capacity to any potential competitor, enabling Perrigo to preserve its monopoly position in the Relevant Market.

72.    In exchange, Perrigo agreed that Gerber would directly and/or indirectly reap a share of Perrigo's profits.

## VI.    Gerber Reneges on the Contract

73.    After PLD and Gerber executed the Contract, PLD contacted Retailers, including Walmart and Walgreens, to promote the Partnership (*see* ¶ 6 above) and the upcoming availability of its Store-Brand infant formula as an alternative to Perrigo's product.

74.    In April 2021, during separate meetings with Walmart and Walgreens, PLD introduced its plan to enter the Relevant Market. PLD then scheduled another meeting with

Walmart for May 13, 2021, to further discuss PLD's entry into such market and the terms of a potential supply agreement between PLD and Walmart.

75.     Gerber notified Perrigo about the Contract and that PLD might soon begin purchasing Gerber's excess supply to be sold as Store-Brand infant formula in competition with Perrigo's products.

76.     PLD and Gerber entered into a commercially-sensitive, confidential agreement, i.e., the Contract. Evidently in breach of its confidentiality obligations under the Contract, Gerber instead colluded with Perrigo to keep PLD out of the market. Gerber's sharing with Perrigo confidential information about a rival is further evidence of anticompetitive conduct.

77.     Perrigo then exercised its "first right of refusal" under the Anticompetitive Agreement.

78.     On May 12, 2021, one day before PLD's scheduled meeting with Walmart, Gerber informed PLD that Gerber would be putting "on hold" the performance of its obligations under the Contract due to an agreement undisclosed to PLD.

79.     On May 13, 2021, PLD asked Gerber to provide more information about the other agreement, including an explanation of how, if at all, Gerber anticipated it might affect the Contract's timeline for bringing competing Store-Brand infant formula to the Relevant Market under the Partnership.

80.     Gerber's CEO, Tarun Malkani, informed PLD that the other "agreement" gave Perrigo a first right for Gerber's business with respect to Store-Brand infant formula pursuant to the Anticompetitive Agreement.

81.     After learning that Gerber would be putting on hold its performance under the Contract, PLD had to cancel its May 13, 2021 meeting with Walmart.

82.     On May 20, 2021, PLD sent Gerber a letter seeking assurances that Gerber intended to honor its commitments to PLD and perform its obligations under the Contract. Instead of providing those assurances, Gerber denied the very existence of the Contract.

83.     PLD nevertheless repeatedly sought assurances that Gerber was taking the necessary steps to fulfill its obligations under the Contract, including filing certain documents with the FDA. In each instance, Gerber ignored PLD's requests.

84.     On September 21, 2021, Gerber General Counsel Kevin Goldberg advised PLD that Gerber had taken no steps and would not take the necessary steps required by the Contract to file the required documents with the FDA, because of its Anticompetitive Agreement with Perrigo.

85.     Gerber and Perrigo's Anticompetitive Agreement has ensured that Perrigo continues to earn monopoly profits by preventing the entry of PLD as a market competitor.

86.     By letter dated September 22, 2021, PLD informed Gerber that its conduct and communications were a repudiation and material breach of the Contract. The letter further advised Gerber that PLD considered the repudiation final, PLD's performance under the Contract excused, the Contract terminated, and that PLD would be seeking damages caused by Gerber's breach.

87.     On September 28, 2021, PLD sued the Defendants here and Nestlé in the Eastern District of New York (Case No. 21-cv-5382), alleging they violated the Sherman Act as well as New York law. On February 6, 2024, the court denied defendants' motion to dismiss for failure to state a claim. *See P & L Development, LLC v. Gerber Products Co. et al*., No. 21-cv-5382, Dkt. No. 102 (the "PLD Action"). That action is pending.

## ANTICOMPETITIVE CONDUCT AND EFFECTS

88.     Through the Anticompetitive Agreement, Defendants have foreclosed competition in the Relevant Market by maintaining Perrigo's monopoly position and keeping competition out of that market. But for Defendants' conduct, PLD would have competed in the market.

89.     As a result, Defendants have impacted a substantial volume of commerce in the Relevant Market and caused antitrust injury to infant formula Retailers as well as consumers. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and the Classes paid supracompetitive prices for Store-Brand infant formula.

90.     Moreover, by blocking PLD from entering the market, Defendants have preserved Perrigo's monopoly power and foreclosed the benefits of competition, i.e., decreased prices and cost, and increased innovation, quality of service, and output.

91.     Plaintiffs' injuries were foreseeable and intended. Defendants were fully aware PLD would be unable to enter the market absent the fulfillment of Gerber's obligations under the Contract.

## DEFENDANTS' CONCEALMENT OF THE CONSPIRACY

92.     Defendants engaged in an illegal scheme to preserve Perrigo's monopoly position in the Relevant Market in violation of the federal and state antitrust laws. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

93.     Defendants kept the Anticompetitive Agreement a secret from consumers, Retailers, and PLD (until months after Gerber and PLD signed the Contract, when it was too late).

94.     Plaintiffs and other members of the Classes had no ability through the exercise of reasonable diligence to learn of the Anticompetitive Agreement before the filing of the PLD Action

when the existence of the Anticompetitive Agreement came to light. Plaintiffs reasonably considered the market for Store-Brand infant formula to be untainted by an illegal conspiracy among Defendants.

95.    Through their misleading, deceptive, false, and fraudulent statements and material omissions, Defendants effectively concealed their anticompetitive conduct from Plaintiffs and the Classes.

96.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and the Classes were unaware of Defendants' unlawful conduct until at least February 1, 2022, and had no way of knowing they were paying supracompetitive prices for Store-Brand infant formula throughout the United States during the Class Period.

## CLASS ACTION ALLEGATIONS

97.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a) and (b)(2), seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> **Nationwide Class:** All persons in the United States who, from April 22, 2020 to the present (the "Class Period"), indirectly purchased Store-Brand infant formula for personal use and not for resale that was manufactured or sold by Perrigo.

98.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages, restitution, and equitable relief pursuant to antitrust, unfair competition, and unjust enrichment laws, on behalf of the following class (the "Damages Class"):

> **Damages Class:** All persons who, during the Class Period, indirectly purchased Store-Brand infant formula in the Indirect

Purchaser States[21] for personal use and not for resale that was manufactured or sold by Perrigo.

99.     The Nationwide Class and Damages Class are referred to collectively as the "Classes" unless otherwise indicated.

100.     Specifically excluded from the Classes are Defendants and their officers, directors, employees, affiliates, legal representatives, heirs or assigns; federal and state governmental entities; any co-conspirator of Defendants; and any judicial officer presiding over this action and the members of his/her immediate family and judicial staff.

101.     **Numerosity**. Plaintiffs do not know the exact number of the members of the Classes. Due to the nature of the trade and commerce involved, Plaintiffs reasonably believe there are millions of members in each Class and that they are sufficiently numerous and geographically-dispersed throughout the United States so that joinder of all class members would be impracticable.

102.     **Class Identity**. The Class members are ascertainable either from Defendants' records or through self-identification in the claims process.

103.     **Typicality**. Plaintiffs' claims are typical of other class members' claims because they were injured through Defendants' uniform misconduct and paid supracompetitive prices for Store-Brand infant formula. Accordingly, by proving their own claims, Plaintiffs will necessarily prove the other class members' claims.

104.     **Common Questions Exist and Predominate**. Common legal or factual questions exist as to all members of the Classes. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was and is applicable to the Classes as a whole. These questions include the following:

---

[21] The "Indirect Purchaser States" are each state in the United States as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

a.   Whether Defendants engaged in a combination or conspiracy to fix, raise, maintain, and/or stabilize the price of Store-Brand infant formula sold in the United States and in each of the relevant states;

b.   The duration of such combination or conspiracy and the nature and character of the acts carried out by Defendants in furtherance of the combination or conspiracy;

c.   Whether such combination or conspiracy violated Section 1 of the Sherman Act;

d.   Whether such combination or conspiracy violated Section 2 of the Sherman Act;

e.   Whether such combination or conspiracy had the effect of artificially inflating the price of Store-Brand infant formula sold in the United States and in each of the relevant states during the Class Period;

f.   Whether the alleged conspiracy violated the relevant states' antitrust or unfair competition laws;

g.   Whether Defendant Perrigo abused its monopoly power in the Relevant Market to gain a competitive advantage in violation of Section 2 of the Sherman Act;

h.   Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the Damages Class;

i.   Whether Defendants' conduct caused injury to Plaintiffs and the Classes;

j.   Whether Defendants took actions to conceal their unlawful conspiracy;

k.   The appropriate injunctive and related equitable relief for the Classes; and

l.   The measure and amount of damages incurred by the Damages Class.

105.    **Adequacy**. Plaintiffs can and will fairly and adequately represent and protect the class members' interests and have no interests that conflict with or are antagonistic to those of the Classes. Moreover, Plaintiffs' attorneys are highly capable and experienced in antitrust and class action litigation.

106.    **Superiority**. Class action treatment is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

107.    The prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

108.    Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

## ANTITRUST INJURY

109.    Defendants' anticompetitive conduct had the following effects, among others:

    a.    Price competition has been restrained or eliminated with respect to Store-Brand infant formula.

    b.    The prices of Store-Brand infant formula have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c.  Purchasers of Store-Brand infant formula have been deprived of free and open competition; and

d.  Indirect purchasers of Store-Brand infant formula, including Plaintiffs and members of the Classes, paid artificially inflated prices.

110.  Throughout the Class Period, Plaintiffs and the Classes indirectly purchased Perrigo-manufactured Store-Brand infant formula in the United States for personal use and not for resale.

111.  As a direct and proximate result of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury to their property, having paid higher prices for Store-Brand infant formula than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

112.  It is well recognized that in a multi-level chain of distribution, such as exists here, an overcharge is felt throughout the chain of distribution. As noted, antitrust scholar Professor Herbert Hovenkamp stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE 564 (1994):

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.

113.    Similarly, economic theory and practice dictates that at least some of the overcharge will be passed on by distributors to end consumers.

114.    Consequently, while the direct purchasers (Retailers) were the first to pay supracompetitive prices, some or all of the overcharge was passed along the distribution chain and absorbed by Plaintiffs and the Classes when they purchased Store-Brand infant formula from Retailers.

115.    Commonly used and well-accepted economic models can be applied to measure both the extent and the amount of the supracompetitive charges passed through the chain of distribution. Thus, the economic harm to Plaintiffs and the Damages Class can be quantified.

116.    The purpose of Defendants' conspiratorial conduct was to raise, fix or maintain the prices of Store-Brand infant formula and, as a direct and foreseeable result, Plaintiffs and the Classes paid supracompetitive prices for Store-Brand infant formula during the Class Period.

117.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury to their property, having paid higher prices for Store-Brand infant formula than they would have paid in the absence of Defendants' illegal conduct and as a result have suffered damages.

**COUNT I**
**Violation of the Sherman Act, Section 1, 15 U.S.C. § 1**
**(On Behalf of the Nationwide Class for Injunctive and Equitable Relief)**
**(Against all Defendants)**

118.    Plaintiffs and the Nationwide Class repeat and allege the foregoing allegations with the same force and effect as if here set forth in full.

119.    Beginning in at least 2021, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, have explicitly

or implicitly colluded to prevent PLD from entering the Relevant Market to supply Retailers with Store-Brand infant formula in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

120.    Plaintiffs and the Nationwide Class have been injured in their property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and the Nationwide Class have paid more for Store-Brand infant formula than they otherwise would have paid in the absence of Defendants' collusive conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from Defendants' unlawful conduct.

121.    Defendants affected the conspiracy through the creation of and enforcement of the Anticompetitive Agreement, which gave Perrigo the first right of refusal to Gerber's excess supply of infant formula.

122.    Through the Anticompetitive Agreement, Defendants prevented PLD from entering the Relevant Market, which maintained the supracompetitive prices that Plaintiffs and the Nationwide Class paid for Store-Brand infant formula.

123.    Plaintiffs and the Nationwide Class have been injured and will continue to be injured by paying more for Store-Brand infant formula than they would have paid and will pay in the absence of the combination and conspiracy as alleged herein.

124.    Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

125.    Plaintiffs and the Nationwide Class have suffered irreparable injury that remedies at law are inadequate to compensate.

126.    The balance of hardships supports issuing injunctive relief and the public interest is not disserved by a permanent injunction.

## COUNT II
### Violation of the Sherman Act, Section 2, 15 U.S.C. § 2
### (On Behalf of the Nationwide Class for Injunctive and Equitable Relief)
### (Against Perrigo)

127.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

128.    Perrigo has at all relevant times had monopoly power in the Relevant Market.

129.     Perrigo willfully and wrongfully obtained and maintained monopoly power by using restrictive or exclusionary conduct, rather than using greater business acumen in violation of 15 U.S.C. § 2.

130.    Plaintiffs and the Nationwide Class have been injured and will continue to be injured by paying more for Store-Brand infant formula than they would have paid and will pay in the absence of Perrigo's continuing exclusionary, anticompetitive conduct.

131.    Plaintiffs and the Nationwide Class are entitled to an injunction against Perrigo, preventing and restraining the violations alleged herein.

132.    Plaintiffs and the Nationwide Class have suffered irreparable injury that remedies at law are inadequate to compensate.

133.    The balance of hardships supports issuing permanent injunctive relief and the public interest is not disserved by a permanent injunction.

## COUNT III
### Violation of the Sherman Act, Section 2, 15 U.S.C. § 2
### (On Behalf of the Nationwide Class for Injunctive and Equitable Relief)
### (Against all Defendants)

134.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

135.    Through the Anticompetitive Agreement, Defendants have illegally prevented a competitor from entering the market for Store-Brand infant formula and have combined and conspired to monopolize it in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

136.    Defendants entered into a conspiracy to monopolize the Relevant Market. Defendants acted with specific intent to achieve and confer the benefits of this unlawful monopoly upon each other by engaging in multiple overt acts in furtherance of their conspiracy as detailed above.

137.    Plaintiffs and the Nationwide Class have been injured and will continue to be injured by paying more for Store-Brand infant formula than they would have paid and will pay in the absence of the combination and conspiracy as alleged herein.

138.    Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

139.    Plaintiffs and the Nationwide Class have suffered irreparable injury that remedies at law are inadequate to compensate.

140.    The balance of hardships supports issuing permanent injunctive relief and the public interest is not disserved by a permanent injunction.

**COUNT IV**
**Violation of State Antitrust Statutes**
**(On Behalf of the Plaintiffs and the Damages Class)**

141.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

142.    Defendants engaged in unfair competition, or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state unfair competition statutes listed below.

143.  **California**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof Code §§ 16270, *et seq.*, with respect to purchases of Store-Brand infant formula in California by Damages Class members and/or purchases by California residents.

   a.  During the Class Period, Defendants marketed, sold, or distributed Store-Brand infant formula in California, and committed and continue to commit acts of unfair competition, as defined by Sections 16720, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

   b.  The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to prevent competition in the market for Store-Brand infant formula.

   c.  For the purpose of forming and effectuating the unlawful trust, Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above.

   d.  The combination and conspiracy alleged herein has had, *inter alia,* the following effects: (1) competition in the sale of Store-Brand Formula has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Store-Brand infant Formula sold by Perrigo have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who

purchased Store-Brand infant formula directly or indirectly from Perrigo have been deprived of the benefit of free and open competition.

e. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their property in that they paid more for Store-Brand infant formula than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Section 16750(a) of the California Business and Professions Code.

144.  **Illinois**. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/1, *et seq.* with respect to purchases of Store-Brand infant formula in Illinois by Damages Class members and/or purchases by Illinois residents.

a. Defendants' combination or conspiracy had the following effects: (i) Store-Brand infant formula price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Store-Brand infant formula prices were raised, fixed, maintained and stabilized at artificially high levels throughout Illinois; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Store-Brand infant formula.

b. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. § 10/3. Accordingly, members of the Damages Class seek all relief available under 740 Ill. Comp. Stat. § 10/1, *et seq.*.

145.  **Michigan**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws Ann. § 445.771, *et seq*. with respect to purchases of Store-Brand infant formula in Michigan by Damages Class members and/or purchases by Michigan residents.

a.  Defendants' combination or conspiracy had the following effects: (i) Store-Brand infant formula price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Store-Brand infant formula prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Store-Brand infant formula.

b.  During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.772. Accordingly, members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq.*

<u>**COUNT V**</u>
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Damages Class)**

146.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

147.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Store-Brand infant formula.

148.    Defendants have benefited from their unlawful acts and it would be inequitable, based on unjust enrichment principles under the laws of each state in the United States as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Store-Brand infant formula.

149.    Plaintiffs and the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

150.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from Defendants' sales of Store-Brand infant formula.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Classes, respectfully request judgment against Defendants as follows:

(1)    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

(2)    That the unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed:

    a.    An unreasonable restraint of trade or commerce in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

    b.    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition laws as set forth herein; and

    c.    Acts of unjust enrichment by Defendants as set forth herein.

(3)    That Plaintiffs and the Damages Class recover damages and any other relief, to the maximum extent allowed under the applicable state laws, and that joint and several judgments in favor of Plaintiffs and the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

(4)    That Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently

enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or  effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

(5)    That Plaintiffs and the Damages Class be awarded pre-and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint;

(6)    That Plaintiffs and the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

(7)    That Plaintiffs and the Classes have such other and further relief as the case may require and the Court deems just and proper.

## <u>TRIAL BY JURY DEMANDED</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues so triable.

Dated:  April 22, 2024                              Respectfully submitted,


By_  */s/   Wyatt B. Durrette, Jr.*_____
Wyatt B. Durrette, Jr., Esquire (VSB No. 04719)
Kevin J. Funk, Esquire (VSB No. 65465)
DURRETTE, ARKEMA, GERSON & GILL P C
Bank of America Center
1111 East Main Street, 16th Floor
Richmond, Virginia  23219
Tel: (804) 775-6900
Fax:  (804) 775-6911
wdurrette@dagglaw.com
kfunk@dagglaw.com

Simon B. Paris (*pro hac vice* application
forthcoming)
Patrick Howard (*pro hac vice* application
forthcoming)
SALTZ MONGELUZZI AND BENDESKY PC
120 Gibraltar Road, Suite 218
Horsham, Pennsylvania  19044
Tel:  (215) 575-3895
sparis@smbb.com
phoward@smbb.com

Michael J. Boni (*pro hac vice* application
forthcoming)
Joshua D. Snyder (*pro hac vice* application
forthcoming)
John E. Sindoni (*pro hac vice* application
forthcoming)
Benjamin J. Eichel (*pro hac vice* application
forthcoming)
BONI, ZACK & SNYDER LLC
15 St. Asaphs Road
Bala Cynwyd, Pennsylvania  19004
Tel:  (610) 822-0200
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com
beichel@bonizack.com

Jeffrey J. Corrigan (*pro hac vice* application
forthcoming)
Jeffrey L. Spector (*pro hac vice* application
forthcoming)
SPECTOR ROSEMAN & KODROFF, P.C.
Two Commerce Square
2001 Market Street, Suite 3420
Philadelphia, Pennsylvania  19103
Tel:  (215) 496-0300
jcorrigan@srkattorneys.com
jspector@srkattorneys.com

Roberta D. Liebenberg (*pro hac vice* application forthcoming)
Gerard A. Dever (*pro hac vice* application forthcoming)
FINE, KAPLAN & BLACK, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, Pennsylvania  19107
Tel:  (215) 567-6565
rliebenberg@finekaplan.com
gdever@finekaplan.com

*Counsel for Plaintiffs and the Proposed Classes*